McRAE ANDERSON ET AL. *v.* BOARD OF APPEALS, TOWN OF CHESAPEAKE BEACH, MD. ET AL.

[No. 531, September Term, 1973.]

*Decided July 12, 1974.*

The cause was argued before MOYLAN, MENCHINE and DAVIDSON, JJ.

*Eugene E. Pitrof,* with whom were *Pitrof & Starkey* on the brief, for appellants.

*Steny S. Hoyer,* with whom were *Hoyer & Fannon* and *Allen S. Handen* on the brief, for appellees.

DAVIDSON, J., delivered the opinion of the Court.

This appeal is from an order of the Circuit Court for

Calvert County which affirmed a decision of the Board of Appeals of the Town of Chesapeake Beach granting variances from the town's zoning ordinance's requirement relating to minimum horizontal distance between facing walls of two buildings and granting a special exception for multiple dwellings in the MCR (Marine Commercial Recreation) district. After a careful review of the record, we find that the action of the Board of Appeals in granting the variances was arbitrary and capricious and should not be sustained. Because the special exception is conditioned on the placement of the buildings as shown on the site plan, and because that placement, absent the grant of the requested variances, is violative of the "distance between facing walls" requirement of the ordinance, the granting of the special exception should not be upheld.

On 26 May 1972 the Mayor and Town Council of Chesapeake Beach enacted a zoning ordinance for the town, which is located in Calvert County. Section 300 of the ordinance divides the town into six classes of districts, or zones, one of which was delineated as the Marine Commercial Recreation (MCR) district. Sections 401(c) and 406 provide that multiple dwellings may be permitted in the MCR district if the Board of Appeals grants a special exception and certain other specified requirements are met. One such specified requirement, contained in § 406 (5) (b) (i), relates to the minimum horizontal distance permitted between facing walls of any two buildings on one lot.[1]

On 19 January 1973 Ronald W. Pickett, contract purchaser of the subject property and one of the appellees in this proceeding, filed an application for a zoning permit and an application for a special exception to develop 22.10 $\pm$ acres of land zoned MCR with 320 condominium apartment units and a 38,000 square foot convenience shopping center. A site plan

---

1. More specifically, § 406 (5) (b) (i) provides:

"[W]here two (2) facing walls both contain a window or windows the minimum horizontal distance shall be three (3) feet of horizontal distance for each foot of average height of the facing wall of the building with greatest height but in no case less than seventy-five (75) feet . . . ."

was attached which indicated that in addition to the commercial facility the applicant proposed to build four apartment buildings, each nine stories high. Parking spaces were to be provided for 898 cars, with 640 spaces allocated to service the apartment dwellers and 258 to service the shopping center. An existing swimming pool, bathhouse and clubhouse were to be improved and retained for use by the residents of the proposed condominiums [2] and four tennis courts were to be constructed for their enjoyment. All four buildings were to be positioned in a row along the edge of the Chesapeake Bay and were to be parallel to one another. The existing swimming pool and bathhouse lies between the proposed sites of Building No. 1 and Building No. 2, which were to be separated by a distance of more than 300 feet. The distance between Buildings No. 2 and No. 3 was to be approximately 90 feet while that between Buildings No. 3 and No. 4 was to be approximately 100 feet. Section 406 (5) (b) (i) requires a minimum distance of about 250 feet between buildings of the height proposed.[3]

On 7 February 1973 the application for a special exception and the accompanying site plan were reviewed by the Planning and Zoning Commission. The minutes of that meeting reflect that a member of the staff of the State Planning and Zoning Commission advised the Commission

2. The site was previously occupied by the Chesapeake Beach Amusement Park.

3. The record is unclear as to the precise distances involved. The minutes of a meeting of the Planning and Zoning Commission held on 7 February 1973 indicate that the proposed buildings were to be 86 feet high, which would necessitate a distance of 258 feet between buildings and that the distance between Buildings No. 2 and No. 3 was to be 90 feet, while between Buildings No. 3 and No. 4 the distance was to be 100 feet. Under this set of facts variances of 168 feet and 158 feet are required.

Although the zoning permit application indicates a building height of 81 feet, the architect testified at the public hearing held by the Board of Appeals on 12 April 1973 that the maximum height would be 80 feet. A site plan submitted to the Board of Appeals at this hearing indicates a distance of approximately 100 feet both between Buildings No. 2 and No. 3 and between Buildings No. 3 and No. 4. Under this set of facts, two variances of either 143 or 140 feet each would be required.

However, at the hearing before the Board of Appeals and here on appeal the parties agree that the ordinance requires a minimum distance of 240 feet between the buildings and that variances of 153 feet and 143 feet are necessary.

not only that variances were required because of non-compliance with § 406 (5) (b) (i) but also that the inclusion of a shopping area was violative of § 406.[4] The Planning and Zoning Commission voted to recommend to the Board of Appeals that the proposed special exception be granted, "providing that all commercial buildings be deleted and that the Board of Appeals grant a variance for the non-compliance of distances between buildings." On 13 February 1973 the Board of Appeals received the following written communication from the Chairman of the Planning and Zoning Commission:

"The Planning and Zoning Commission accepts the plan submitted by Mr. Ron Pickett to construct four nine-story buildings on site of attached plan, providing you delete all commercial on said plan and that you grant a variance for the non-compliance of distances between buildings required in Section 406 (5) (b) (i)."

. Thereafter Mr. Pickett filed an application for a variance alleging that:

"Due to the exceptional physical characteristics of the site a hardship is created by conforming to the 3′ for 1′ which would deprive me of the reasonable use of the land and buildings."

On 12 April 1973 a hearing was held before the Board of Appeals. The site plan submitted there deleted the proposed commercial use in its entirety, but the four proposed apartment buildings remained in approximately the same position they had occupied on the original site plan.

Two witnesses testified with respect to the need for the requested variances. Mr. Ronald W. Pickett, the contract purchaser of the property, testified that the property, bounded on the west by Route 261 and the east by the

4. Section 406 provides for a minimum lot area of 3,000 square feet for each unit in an MCR development. The staff member pointed out that on a tract of 22.1 acres, where 960,000 square feet would be needed to fulfill the requirements for the erection of 320 units, only 2,676 square feet would be left for the construction of the shopping area.

Chesapeake Bay, is "very unique." It is "almost like an L shape" with the southern portion of the property being considerably narrower than the northern portion. Building No. 1 is located on "Pool Hill," a hill which "slopes rather quickly down to the swimming pool." The location of Building No. 1 was dictated by the setback requirements of the ordinance and the slope of the hill, which together prohibited the placement of the building on any other spot. According to Mr. Pickett "there is no other way for us to locate that building. . . . We were locked in on the first building site, we virtually had no alternative if we were going to use that particular piece of property, Pool Hill. Because of the requirements of the ordinance and the dimensions of the building, that building had to go there."

Mr. Pickett further testified that the topography of the site also dictated the location of the remaining three buildings. He pointed out that the terrain generally slopes upward from Route 261, the western boundary of the property, to the center of the property, and then slopes downward, finally leveling off near the water's edge. Three alternatives were available. Buildings No. 2, No. 3 and No. 4 could have been located near the western boundary of the property at the bottom of the slope, "which would have meant that our people wouldn't even have any view of the water." They could have been located on the top of the hill, "which would have given us higher elevations and probably more water view," but which also "would have been much more obtrusive from Route 261." Finally, they could have been located on the level land on the east side of the slope near the water's edge. The latter alternative was chosen to maximize the residents' view of the water and minimize the visibility of the structures from Route 261.

Mr. Pickett testified that the possibility of replacing Buildings Nos. 2, 3 and 4 with two buildings was considered. He pointed out that in order to "use the density to maximize the value of the property" the two substitute buildings would have to be 12 or 13 stories in height. While such a mode of development would have obviated the need for a variance and would have been more economical to construct,

this alternative was rejected "in order to minimize the appearance of the structures from the road." Consideration was also given to placing Building No. 3 to the rear of, rather than between, Buildings No. 2 and No. 4. This alternative was rejected for a variety of reasons. Since the balconies on the rear building would overlook the balconies on the front buildings, the arrangement would interfere with the privacy which the balconies were specifically designed to provide. Parking would have to be provided in front of Building No. 3, which would interfere with the residents' view of the natural beauty of the shoreline. Either Building No. 3 would have to be located on the crown of the hill, making the building more visible from the road, or the crown of the hill would have to be removed to make the building less visible from the road, neither of which was a desirable mode of development. Finally, the principles of sound planning would be violated by the changes in the traffic patterns which would be required and which would result in residents from all the buildings driving in front of Building No. 3. Under the proposed site plan, mobile activity is confined to the rear of all the buildings.

Mr. Herbert Fleischer, an architect, engineer and planner, who had prepared the site plan for the subject property, qualified as an expert. He testified that the subject property had "intriguing natural beauty" with distinct contours and vegetation which should not be disturbed. He opined that the buildings are located so as to preserve the shoreline and indeed to enhance the view from the bay toward the project. He stated that although it would have been possible to place Building No. 3 in a different location, the plan as drawn maximized the permissible density while producing a "well-organized project." In his view, the four roughly parallel buildings are more in harmony with the appearance and character of Chesapeake Beach than a "staggered" layout would be. Moving the building to the west, behind Buildings No. 2 and No. 4, would mean building it in a "hole" behind the hill. In addition a parking area would be required in front of the building which would have divided the planned open park recreation area. Such a parking lot would

destroy the "resort" character of the project and create traffic hazards for pedestrians attempting to use it. Mr. Fleischer concluded his testimony on direct examination by stating that the grant of the requested variances would have no adverse effect on the residents of the buildings, the abutting property owners, the surrounding properties or the neighborhood of Chesapeake Beach. Indeed, in his view, the development as planned would enhance the general area.

On recross-examination the following colloquy took place:

"Q. The only other question I would ask, can you tell the board what hardship would be suffered by your client if the variance was not granted?

"A. The only hardship would be the loss of income because you couldn't have the other buildings. You see, you have to approach it two ways. My opinion is, the density that we have is a low one, in my opinion.

"Q. If you would just try to answer the question directly, if you can, what hardship would you suffer if the variance is not granted?

"A. Maybe poor planning.

"Mr. Handen [Town Attorney for Chesapeake Beach]: I think we have batted back and forth enough, gentlemen, it's got to come to an end."

On 18 April 1973 the Board of Appeals issued a written statement and decision. With respect to the request for variances, the Board of Appeals found, among other things:

"1. That, as a matter of fact, the variance requested will not be contrary to the public interest and that practical difficulties and unnecessary hardship would result if it is not granted.

* * *

"4. That, as a matter of fact, the Petitioner met the burden of proving unique circumstances in that a strict application of the Zoning Ordinance would deprive the Petitioner of the reasonable use of his land and proposed buildings.

"5. That, as a matter of fact, Petitioner met the burden of proving unnecessary hardship as required by the Ordinance in that to disallow the variance would impose a special hardship on the subject property.

"6. That, in addition to paragraphs numbered 1 through 5 above, the Board found as a fact that the granting of the variance is necessary for the reasonable use of the land and Petitioner's buildings; that the hardship complained was nót economical nor self-created; that the hardship resulted from the application of the Ordinance and that the hardship would be specifically suffered by the property in question."

With respect to the special exception the Board of Appeals found:

"7. That, as a matter of fact, the special exception requested is consistent with the spirit, purpose and intent of the Ordinance.

"8. That, as a matter of fact, the special exception requested is suitable for the property in question and designed to be in harmony with and appropriate in appearance with the existing and intended character of the general vicinity; and that the special exception does not adversely effect street traffic and safety."

The Board of Appeals granted the variances and special exception subject to a condition, among others, "that petitioner must substantially adhere to matters of construction to the initial plans presented before the Board." [5]

5. Section 1002 (c) of the zoning ordinance states that each resolution of the Board of Appeals "shall contain a statement of the grounds and any findings forming the basis of such action or decision." Despite repeated admonitions by the Court of Appeals that the findings of administrative boards are not to be limited to conclusions couched in the terms of the ordinance itself but rather are to include specific findings of facts that support their conclusions, the Board of Appeals in this case set forth its conclusions in its statement and decision in a boilerplate form employing

On 3 August 1973 the Circuit Court for Calvert County affirmed the grant of the variances and the special exception. With respect to the variances, the Court said:

"Finally, with respect to the granting of the Variance, the Appellant's position seems to be that because the Applicants' desire to use their land to the fullest extent, the need for the Variance is something they created and, therefore, it should not be considered. The Board, however, seemed to take the position that there was a problem created by the special topographic features and existing structures on this property, as well as its relation to the principal natural feature of the area; that is, the Chesapeake Bay, which entitled the Applicants to some consideration. Once again, this is a matter of judgment and in view of the evidence bearing on this question, the Court is satisfied that the Board had before it sufficient evidence to support the result it reached."

The appellants, McRae and Carmen Anderson, who opposed the granting of the application at the Board of Appeals hearing and appealed the Board's decision to the Circuit Court, contend that the zoning ordinance of the Town of Chesapeake Beach requires the applicant to show that a denial of the requested variance would result not only in "practical difficulty" but also in an "unnecessary hardship" depriving the owner of the reasonable use of the land or building involved. They maintain that because this dual showing was not made, the action of the Board in granting the variances was arbitrary and capricious.

The appellees, the Board of Appeals and Mr. Pickett, the applicant, contend that the variances requested in this case involve an "area variance" (a variance from area, height, density, setback, or sideline restrictions, such as a variance from the distance required between buildings) and not a

---

the terms of the ordinance itself without setting forth any specific findings of fact. *See, e.g.,* Hooper v. City of Gaithersburg, 270 Md. 628, 637, 313 A. 2d 491, 496 (1974); Baker v. Board of Trustees, 269 Md. 740, 747, 309 A. 2d 768, 771-72 (1973); Pistorio v. Zoning Board, 268 Md. 558, 570, 302 A. 2d 614, 619 (1973); Turner v. Hammond, 270 Md. 41, 56, 310 A. 2d 543, 551 (1973).

"use variance" (a variance which permits a use other than that permitted in the particular district by the ordinance, such as a variance for an office or commercial use in a zone restricted to residential uses). They maintain that area variances may be allowed on proof of "practical difficulty" alone and that such variances do not require a showing of "undue hardship." They insist that more than sufficient evidence was presented to make the question of whether practical difficulties would result from the denial of the requested variances "fairly debatable." They conclude that the action of the Board in granting the requested variances and the special exception should be upheld.

The Court of Appeals has recognized a distinction between a use variance, which changes the character of the zoned district, and an area variance, which does not. Use variances are customarily concerned with "hardship" cases, where the land cannot yield a reasonable return if used only in accordance with the use restrictions of the ordinance and a variance must be permitted to avoid confiscatory operation of the ordinance, while area variances are customarily concerned with "practical difficulty." *Loyola Loan Ass'n v. Buschman*, 227 Md. 243, 248, 176 A. 2d 355, 358 (1961). Where the standard of undue hardship applies, the applicant, in order to justify the grant of the variance, must meet three criteria:

1) If he complied with the ordinance he would be unable to secure a reasonable return from or to make any reasonable use of his property. *Pem Co. v. Baltimore City*, 233 Md. 372, 378, 196 A. 2d 879, 882 (1964); *Marino v. City of Baltimore*, 215 Md. 206, 218, 137 A. 2d 198, 202 (1957); *see Salisbury Bd. v. Bounds*, 240 Md. 547, 555, 214 A. 2d 810, 815 (1965). Mere financial hardship or an opportunity to get an increased return from the property is not a sufficient reason for granting a variance. *Daihl v. County Board of Appeals*, 258 Md. 157, 167, 265 A. 2d 227, 232 (1970); *Salisbury Bd. v. Bounds, supra,* 240 Md. at 555, 214 A. 2d at 814; *Marino v. City of Baltimore, supra; Easter v. City of Baltimore*, 195 Md. 395, 400, 73 A. 2d 491, 492 (1950).

2) The difficulties or hardships were peculiar to the property in question and contrast with those of other property owners in the same district. *Burns v. Baltimore City,* 251 Md. 554, 559, 248 A. 2d 103, 106 (1968); *Marino v. City of Baltimore, supra; Easter v. City of Baltimore, supra.*

3) The hardship was not the result of the applicant's own actions. *Salisbury Bd. v. Bounds, supra; Marino v. City of Baltimore, supra; Gleason v. Keswick Impvt. Ass'n,* 197 Md. 46, 50-51, 78 A. 2d 164, 165-66 (1951).

Where the standard of "practical difficulty" applies, the applicant is relieved of the burden of showing a taking in a constitutional sense, as is required under the "undue hardship" standard. In order to justify the grant of an area variance the applicant need show only that:

"1) Whether compliance with the strict letter of the restrictions governing area, setbacks, frontage, height, bulk or density would unreasonably prevent the owner from using the property for a permitted purpose or would render conformity with such restrictions unnecessarily burdensome.

"2) Whether a grant of the variance applied for would do substantial justice to the applicant as well as to other property owners in the district, or whether a lesser relaxation than that applied for would give substantial relief to the owner of the property involved and be more consistent with justice to other property owners.

"3) Whether relief can be granted in such fashion that the spirit of the ordinance will be observed and public safety and welfare secured." *McLean v. Soley,* 270 Md. 208, 214-15, 310 A. 2d 783, 787 (1973), quoting 2 *Rathkopf, The Law of Zoning and Planning,* 45-28-29 (3d ed. 1972).

The lesser burden is permitted because the impact of an area variance is viewed as being much less drastic than that of a use variance.

While a distinction between use and area variances has been recognized and clearly articulated in Maryland, the Court of Appeals has applied the "practical difficulty" standard to area variance applications in only three cases. *McLean v. Soley, supra,* 270 Md. at 213-14, 310 A. 2d at 786-87; *Zengerle v. Bd. of Co. Comm'rs,* 262 Md. 1, 21, 276 A. 2d 646, 656 (1971); *Loyola Loan Ass'n v. Buschman, supra,* 227 Md. at 248-50, 176 A. 2d at 358-59. In each of them the governing local ordinance authorized the grant of an area variance when strict compliance with the regulations would result in practical difficulties *or* unreasonable hardship. In each of them the Court of Appeals emphasized that the grant of the requested area variance was justified on proof of "practical difficulty" alone and that proof of hardship was not required because the governing zoning ordinance, which phrased the criteria of "practical difficulty or unreasonable hardship" in the disjunctive, could be construed as requiring that only the lesser standard of proof be applied.

The zoning ordinance of the Town of Chesapeake Beach differs from those ordinances in a number of significant respects. Section 1005 (c) (2) of the ordinance prohibits the Board of Appeals from granting a use variance. Section 1005 (a) authorizes the Board to grant an area variance only where the strict application of the regulations "would result in practical difficulty *and* unnecessary hardship depriving the owner of the reasonable use of land or building involved. . . ." (Emphasis added.) Section 1005 (c) provides that the applicant must show that "practical difficulty *and* unnecessary hardship will result if [the variance] is not granted." (Emphasis added.) Section 1005 (c) (3) provides that:

> "There must be proof of unique circumstances . . . and that said circumstances or conditions are such that strict application of the provisions of this Ordinance would deprive the applicant of the reasonable use of such land or building."

Finally, § 1005 (c) (5) requires an applicant to show:

> "That the granting of the variance is necessary for the reasonable use of the land or building and that

the variance as granted by the Board is the minimum variance that will accomplish this purpose. It is not sufficient proof of hardship to show that greater profit would result if the variance were awarded. Furthermore, hardship complained of cannot be self-created; it cannot be claimed by one who purchases with or without the knowledge of restrictions; it must result from the application of the Ordinance; it must be suffered directly by the property in question; and evidence of variance granted under similar circumstances shall not be considered."

Thus the zoning ordinance of the Town of Chesapeake Beach permits area variances only. Not only does it express the criteria of practical difficulty and unnecessary hardship in the conjunctive, but it also independently requires that no area variance be granted unless it is shown that strict application of the regulations will deprive the applicant of the reasonable use of his land and that the grant of the variance is necessary for the reasonable use of the land. It defines the hardship which must be shown as the equivalent of a constitutional taking, and utilizes the same criteria employed by the Court of Appeals for establishing undue hardship. The words of the statute are clear and unambiguous and require no construction. Under the express terms of the ordinance, an area variance can be granted only if there is proof that the strict application of the regulations would result in an unnecessary hardship which deprives the owner of the reasonable use of his land. Proof of "practical difficulties" alone is insufficient. *McLean, Zengerle* and *Loyola, supra,* are inapposite.

Appellees do not contend that the applicant presented sufficient proof of an unnecessary hardship which deprived the owner of the reasonable use of his land. The record shows that the only hardship allegedly suffered by the applicant as a result of the strict application of the ordinance is "loss of profit" and "maybe poor planning." This evidence falls far short of a showing of unnecessary

hardship as defined by the specific ordinance here involved as well as by the Court of Appeals. One who shows no more than that the granting of the variance would do no harm and that it would be profitable to him fails to meet the burden. *M. & C. C. v. Polakoff,* 233 Md. 1, 9, 194 A. 2d 819, 824 (1963). Moreover, the very testimony which shows the practical difficulties encountered in attempting to develop the land at a maximum density in accordance with the distance between buildings restriction simultaneously establishes unequivocally that not only is it possible to develop the land at the maximum permitted density in accordance with the distance between buildings requirement, but also that such development could be less costly than the mode of development proposed. Given the evidence presented on behalf of the applicant, it is impossible for him to contend that the strict application of the ordinance prevents him from making a reasonable use of his land.

Based on the record before us, we find that the question of whether the strict application of the distance between buildings requirement would result in an unnecessary hardship to the applicant by depriving him of the reasonable use of his land was not fairly debatable. *Baltimore v. Sapero,* 230 Md. 291, 296, 186 A. 2d 884, 887 (1962); *Marino v. City of Baltimore, supra,* 215 Md. at 222, 137 A. 2d at 205. The action of the Board of Appeals in granting the variances was arbitrary and capricious and cannot be sustained. *Daihl v. County Bd. of Appeals, supra,* 258 Md. at 167, 265 A. 2d at 232; *Dampman v. M. & C. C. of Baltimore,* 231 Md. 280, 286-87, 189 A. 2d 631, 634 (1963). Because the grant of the special exception is conditioned on adherence to a site plan in which, absent the variances, the buildings are located in a manner violative of the ordinance, it too cannot be sustained. Accordingly, the order of the lower court affirming the grant of the variances and the special exception shall be reversed.[6]

*Order reversed.*

*Costs to be paid by appellees.*

---

6. In view of our decision, all of the other contentions made by appellants need not be considered.